# In the United States Court of Federal Claims

No. 15-982C
(Filed:  September 25, 2015)*
**\*Opinion originally issued under seal on September 18, 2015**

|  |  |  |
|---|---|---|
| EMTA ISAAT, A.S., | ) | |
| | ) | |
| Plaintiff, | ) | Bid Protest; Temporary Restraining |
| | ) | Order; Preliminary Injunction; |
| v. | ) | National Security; Balance of |
| | ) | Hardships; Price Realism Analysis; |
| THE UNITED STATES, | ) | Deference to Agency; Technical |
| | ) | Acceptability |
| Defendant. | ) | |
| | ) | |

*John M. Manfredonia*, Cresskill, NJ, for plaintiff.

*Gregg P. Yates*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Deborah A. Bynum*, Assistant Director.  *Aaron G. Lake*, Deputy Chief, Commercial Litigation Field Support, Air Force Legal Operations Agency, Joint Base Andrews, MD, of counsel.

## MEMORANDUM OPINION DENYING TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**FIRESTONE**, *Judge*.

In this post-award bid protest, Plaintiff EMTA Insaat, A.S. ("EMTA"), a Turkish commercial construction company, challenges the award of a fixed-price construction contract by the United States Air Force 39th Contracting Squadron ("the agency" or "the government") to repurpose a hangar at Incirlik Air Base, Turkey, to serve as the new military headquarters of the Combined Joint Special Operation Task Force-Syria

(CJSOTF-S).  The awardee is Artek Insaat, A.S. ("Artek"), another Turkish construction company.

EMTA filed its original complaint in this bid protest on September 4, 2015, claiming that the government failed to conduct a proper price realism analysis of Artek's lowest cost proposal, which, if done, would have (1) rendered Artek's proposal ineligible, and (2) resulted in the award of the contract to EMTA.  The court held a status conference with the parties on September 8, 2015.  On September 9, 2015, the government provided a description of the status of performance under the contract.  The government's description included a schedule which anticipates groundbreaking on September 16, 2015 and "beneficial occupancy" by November 20, 2015.  On September 10, 2015, EMTA applied for a temporary restraining order and preliminary injunction to prevent the government from going forward with performance while the bid protest is pending.  In its motion, EMTA argues that it is likely to succeed on the merits and will be irreparably harmed without a temporary halt to construction.

On September 11, 2015, the government filed a response to EMTA's motion.  In its response, the government argues that EMTA is not likely to succeed on the merits and that the government's and the public's interest weigh heavily against granting temporary injunctive relief and halting construction.  The government included with its response a declaration from Major General Michael K. Nagata, who has been Commander of the Combined Joint Interagency Task Force-Syria (CJIATF-S) since October 17, 2014.  CJIATF-S is a joint military command headquartered in Al Udeid Air Base, Doha, Qatar, with one subordinate organization, CJSOTF-S.  CJIATF-S and CJSOTF-S are

responsible for conducting the Syria Train and Equip Program.[1]  The mission of the Syria

Train and Equip Program is to (1) defend the Syrian people from attacks by the Islamic

State of Iraq and the Levant (ISIL); (2) secure territory controlled by the Syrian

opposition; (3) protect the United States, its friends and allies, and the Syrian people from

the threats posed by terrorists in Syria; and (4) promote the conditions for a negotiated

settlement to end the conflict in Syria.  Major General Nagata states that it is necessary to

relocate the CJSOTF-S headquarters from its current, temporary location in [. . .]  to

Incirlik Air Base as soon as possible in order to meet the needs of the mission in a more

timely and effective manner.  Def.'s Opp'n A2-3.  Major General Nagata states that

"[b]eneficial occupancy of the CJSOTF-S headquarters facility at Incirlik Air Base is,

from an operational standpoint, critical" and that any "delays in relocating the CJSOTF-S

headquarters to Incirlik Air Base will be detrimental to the overall coalition effort and

mission to provide support to the appropriately vetted Syrian opposition."  Def.'s Opp'n

A3.  He concludes that "ultimately, a delay in relocation of this headquarters is a threat to

the success of the program."  Id.

        The government's response to EMTA's motion also included a declaration from

Colonel John C. Walker, who has been Commander of the 39th Air Base Wing at Incirlik

Air Base since July 31, 2015.  Colonel Walker also states that it is necessary to relocate

the CJSOTF-S headquarters to Incirlik Air Base as soon as possible.  Def.'s Opp'n A6-7.

---

[1] The program is authorized under section 1209 of the Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, 128 Stat. 3292 (2014).

In addition, Colonel Walker states that "[t]here were, and currently are, absolutely no existing facilities at [Incirlik Air Base] that will meet CJSOTF-S's facility needs."  Def.'s Opp'n A7.  Colonel Walker similarly concludes that maintaining a "beneficial occupancy date" of November 20, 2015, "from an operational standpoint, is critical" and that [u]ltimately, a delay in relocating this headquarters is a threat to the success of the program."  Def.'s Opp'n A8.

On September 14, 2015, EMTA filed a reply to the government's opposition, challenging the government's arguments.  Also on September 14, 2015, EMTA filed an amended complaint with an additional allegation that the government improperly waived a requirement of the solicitation.  Specifically, EMTA argues that Artek failed to provide a list of equipment and materials required to perform the contract and thus was not eligible for award.[2]

On September 15, 2015, EMTA filed a supplemental reply to the government's opposition.  EMTA attached to its supplemental reply documents that EMTA had received from the government but that had not been filed as part of the administrative record.  These documents included an e-mail exchange regarding the treatment of weakness in various proposals, including Artek's and EMTA's proposals.  On September 16, 2015, the government corrected the administrative record to include documents that were omitted from the initially filed record, including the e-mail exchange referenced in

---

[2] EMTA also raises this argument in its reply to the government's opposition to EMTA's motion for a temporary restraining order and preliminary injunction.  Pl.'s Reply 4, 11.

EMTA's supplemental reply.  Finally, on September 17, 2015, the government filed a sur-reply.[3]

The court has determined that oral argument is not necessary.  For the reasons that follow, EMTA's Motion for a Temporary Restraining Order and Preliminary Injunction is **DENIED**.

I.    FACTS

A.    <u>The Solicitation</u>

On July 2, 2015, the agency issued a Request for Proposals ("RFP" or "solicitation") to repurpose a hangar at Incirlik Air Base.  Administrative Record ("AR") 622.  The RFP provided that the government intended to award a firm fixed price contract to the lowest priced technically acceptable offeror in accordance with Federal Acquisition Regulation ("FAR") 15.101-2.  AR 63.  Also in the RFP, "[t]he Government reserve[d] the right to refrain from awarding to any contractor in the event that all Offerors [were] determined to have offered pricing that [was] not considered realistic, reasonable, or complete."  AR 67.

---

[3] The government's sur-reply included a declaration from Technical Sergeant Matthew Mayo, a contingency contracting officer who is responsible for the acquisition of supplies, services, and construction in support of CJSOTF-S.  However, the statements in Technical Sergeant Matthew Mayo's declaration go beyond the administrative record and the government did not move to supplement the record.  Therefore, the court will not consider this new material.  EMTA's motion to partially strike the declaration of Matthew Mayo is **DENIED** as moot.  <u>See generally</u> <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d 1374, 1380 (Fed. Cir. 2009) ("[S]upplementation of the record should be limited to cases in which the 'omission of extra-record evidence precludes effective judicial review.'" (citing <u>Murakami v. United States</u>, 46 Fed. Cl. 731, 735 (2000))).

The RFP specified how proposals would be evaluated.  The RFP explained that the government would evaluate, in order, price and technical capability.  With respect to evaluation of prices, the RFP provided that—

> Each offer received in response to this solicitation will be evaluated based on total proposed price.  All offerors['] proposed prices will be evaluated to ensure they are realistic, reasonable, and complete.  All offerors whose prices are found to be realistic, reasonable, and complete, will be ranked by total proposed price, from lowest to highest.  . . .  All offerors who are ranked by total proposed price will have their technical volume forwarded to the Technical Evaluation Board for evaluation.

AR 67.  Section L of the RFP (titled "Instructions, Conditions and Notices to Bidders") instructed offerors to complete a Construction Cost Estimate Breakdown Form INC 1101 ("Form INC 1101").  AR 86.  Offerors were directed to include on Form INC 1101 all associated design, labor, material, overhead, and profit for the requested project.  Id.

Section M of the RFP (titled "Evaluation") described the basis for the contract award (Section M-1) and the evaluation factors and award process (Section M-2).  AR 90-92.  Section M-2 specified that the "[p]rices will be evaluated for completeness, reasonableness, and balance [in accordance with] FAR 15.305(a)(1) and FAR 15.404."[4] AR 91.  Offerors were required to submit "a total estimated amount for the performance of the entire project."  Id.  The RFP reiterated that prices would "be evaluated on total price for the overall project."  Id.

The RFP also explained that the government's technical evaluation team would evaluate proposals on an "acceptable" or "unacceptable" basis, and that only those

---

[4] Section M-2 of the RFP also provided that a "price fair and reasonable determination [would] be made on the apparent successful offer prior to award."  AR 92.

proposals that clearly met the minimum requirements of the solicitation would be considered for award.  AR 67, 91-92.  Technical capability included two subfactors: technical capabilities and progress schedule.  AR 67.  In particular, the RFP required offerors to provide "[a] narrative to demonstrate a sound approach and methodology for accomplishing work requirements identified in the solicitation with the appropriate skills, equipment, and materials, in the appropriate quantities with specifications, and at the appropriate time to meet the Government's desired outcomes."  AR 65, 87.  This information was to "clearly demonstrate the contractor's capability to manage all resources required to perform the requirements outlined in th[e] solicitation."  Id. Finally, the RFP noted that any material list provided by an offeror would not be "official" or approved until the construction phase of the project.  Id.

The agency received five proposals by the due date of July 20, 2015.  AR 622.  All of the five proposals were sent to the technical evaluation team on the same day.  Id.  The technical evaluations were completed by July 30, 2015.  Id.  The following day, the contracting office requested clarification of some of the comments on the technical evaluations "to ensure evaluations were conducted in accordance with section M of the solicitation."  Id.  The evaluations were revised by August 5, 2015.  AR 623.  [ . . . ] of the five proposals, including the proposals by EMTA and Artek, were found to be acceptable.  Id.  One proposal [ . . . ] was found to be unacceptable due to the omission of a material list.  AR 624.

Both EMTA and Artek provided detailed price schedules, AR 115-35, 400-19, and narratives to show how they would produce an end product to meet or exceed contract

requirements.  AR 384-91, 580-84.  EMTA and Artek also provided lists of construction

materials they would use in the project and identified a manufacturer for each of the

materials.  AR 391-94, 437-39.  EMTA identified 66 types of construction materials and

Artek identified 81 types of construction materials.  Id.  However, Artek expressly

provided "estimated" quantities and specified that "estimated quantities may vary after

final design."  AR 437.  In its list, Artek provided an estimated quantity for only 49 of its

81 materials, listing the estimated quantity for the remaining 32 items as "TBD."  AR

437-39.  EMTA either omitted or did not list separately certain materials that Artek listed

as "TBD," such as sprinkler pipe.  AR 392, 437.

### B.    The Evaluation and Best Value Determination

The Source Selection Decision Document ("SSDD") states that the agency's initial

technical evaluation identified five weaknesses in Artek's proposal.  AR 625.[5]  The

Technical Evaluation Board stated that (1) Artek's material list did not include a media

wall; (2) the proposed transformer was not the preferred brand; (3) the proposed testing

agency was not a Certified Commissioning Authority; (4) some catalog data differed

from the material list; and (5) quantities for some items were listed as "TBD" on the

material list.  AR 597, 625.  The contracting office did not agree with these findings, AR

609-10, and after further review the agency determined that Artek's proposal was

"acceptable."  AR 625.  The SSDD notes that the revised technical evaluation found

---

[5] It is not clear from the record whether the initial technical evaluation found Artek's proposal acceptable or unacceptable.  *Compare* AR 597-98, 601-02, 609, 742-43 (identifying Artek's proposal as acceptable), *with* AR 625 ("Initial technical evaluation found Artek technically unacceptable.").

Artek's proposal "acceptable" for the following reasons:  (1) a "media wall was in fact listed on [Artek's] material list"; (2) "no brand preference was stated [in the RFP] for the transformers"; (3) "it was determined . . . that although the proposed testing agency was not a [Certified Commissioning Authority], numerous agencies were available in the local area and that the issue with the agency could be addressed during the design phase"; (4) "[i]t was determined . . . that the catalog data was in line with the requested specifications per the Statement of Work"; and (5) "[a]lthough specific quantities were not listed for each line item on [Artek's] material list, it was determined that the contractor had a good understanding of work to be performed and that quantities would be solidified during the design phase."  Id.[6]

Although the SSDD does not expressly reference the price realism analysis provision from the solicitation, the agency prepared an "abstract of quotations" that compared all of the offers against the independent government cost estimate (IGCE), AR 621, and the SSDD includes the following discussion of Artek's proposed price:

> The price submitted by Artek in the amount of $969,810.80 is [. . .]% lower than the next lowest offer EMTA.  Artek's overhead and profit combined are [. . .]%, which is [. . .]% lower than EMTA's rate of [. . .]%; their labor costs are lower as well.  Artek's price is also [. . .]% lower than [. . .] proposal who[se] overhead and profit rates combined were the same as EMTA at [. . .]%.  Based on this analysis, it is evident that the direct costs provided by Artek are in line with the other offerors, however what

_____

[6] The SSDD notes that the initial technical evaluation for EMTA identified two weaknesses:  (1) "[t]he proposed media wall was a low quality system when compared to the other offerors and that verification was needed for the proposed roof top units"; and (2) "[v]erification of the proposed roof top units was needed."  AR 624.  The contracting office pointed out that the media wall should be listed as acceptable or unacceptable and not compared to products submitted by other offerors, and that any items listed as needing verification would require conducting evaluation notices with all offerors.  Id.  The agency's revised evaluation removed comments regarding the media wall but not the roof top units.  Id.

> set them apart are their indirect and labor costs.  Based on these facts, it has
> been determined that the price submitted by Artek is fair, reasonable, and
> represents the best value to the Government.

AR 626.  Ultimately, the agency determined that the proposal submitted by Artek offered

the best overall value to satisfy contract requirements and that Artek met all requirements

of the solicitation.  AR 622.  The SSDD states that the "selection was made [in

accordance with] FAR 15.101-2, to the offeror whose evaluated proposal represented the

lowest price and was considered to be technically acceptable" and that "[t]he

documentation contained within this report indicates the basis of a fair and reasonable

price determination."  AR 627.  On August 7, 2015, the agency awarded the contract to

Artek.  AR 629-30 (Contract No. FA 5685-15-C-0007).

### C.   Post-Award Activities and EMTA's Agency Protest

In a memorandum dated August 7, 2015, the agency notified EMTA that its

proposal was not selected for award.  AR 662.  The memorandum notes that five offerors

were solicited and five proposals were received.  Id.  The memorandum also provides the

name and address of the offeror receiving the award and the total contract price.  Id.

Finally, the memorandum describes the process for requesting a debriefing regarding the

basis for the selection decision and contract award.  Id.

On August 11, 2015, EMTA requested a debriefing.  AR 672.  In a memorandum

dated August 13, 2015, the agency provided a description of the source selection

procedure and award.  AR 675.  The memorandum states that no significant weaknesses

were identified in EMTA's proposal and presents the results of the government's

evaluation findings.  Id.  The memorandum describes the evaluation process as consistent

with Section M of the solicitation:  "all offers were initially ranked according to price, followed by a technical evaluation of the technical proposals on a pass/fail basis."  Id. Those findings showed that EMTA's offer was ranked second according to price and that the technical capabilities of the four best priced offers were rated acceptable.  Id.  The memorandum concludes that "[b]ased on a Lowest Priced Technically Acceptable evaluation, award of contract FA5685-15-C-0007 was made to [Artek] for the price of $969,810.80."  AR 676.

EMTA protested the award at the agency level.  EMTA claimed that the contract award to Artek was improper because Artek's price proposal was unrealistically low.[7] AR 677, 725.  The agency denied EMTA's protest in a memorandum dated August 31, 2015.  AR 725.  The memorandum explains that "[p]rice evaluations were conducted based on pricing information submitted on Form INC 1101s as stated in Instructions to Offerors 4(a)(i)," and that price evaluations were conducted based on total price for the overall project as stated in section M-2 of the solicitation.  AR 725-26.  The memorandum further states that "[t]he Technical Evaluation team did not find Artek's proposed price to be unrealistically low and . . . deemed the Offeror capable and could successfully complete this requirement."  AR 726.  The memorandum continues, "[w]ith Contracting review, the Selection team concurred with the Technical Evaluation and

---

[7] In addition, EMTA argued that the contract award was improper to the extent the agency conducted discussions with Artek.  AR 681-82, 726.  The agency's memorandum stated that "[n]o discussions were held with any interested parties in response to the solicitation, and based on the evaluations conducted by [the agency's] subject matter experts on the initial proposals received[,] this award was made to Artek without discussions."  AR 726.  EMTA has not raised a claim in this court regarding improper discussions.

proceeded with an award to the Lowest Priced Technically Acceptable Offeror." Id.  On

September 4, 2015, EMTA filed its bid protest complaint in this court.

## II.   STANDARD OF REVIEW

### A.   Standard for Procurement Challenges

In a bid protest case, the standard of review of an agency's action is governed by

the Administrative Procedure Act, 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4).  This

standard is "highly deferential."  Advanced Data Concepts, Inc. v. United States, 216

F.3d 1054, 1058 (Fed. Cir. 2000).  The court may not set aside an agency's action unless

the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252

(Fed. Cir. 2015) (quoting Savantage Fin. Servs. v. United States, 595 F.3d 1282, 1285

(Fed. Cir. 2010)).  In that connection, "[t]he court's task is to determine whether '(1) the

procurement official's decision lacked a rational basis; or (2) the procurement procedure

involved a violation of regulation or procedure.'"  Id. (quoting Savantage, 595 F.3d at

1285).

A challenger may not use a bid protest as an opportunity to challenge the terms or

requirements of the solicitation itself.  In Blue & Gold Fleet, L.P. v. United States, the

Federal Circuit held that "a party who has the opportunity to object to the terms of a

government solicitation containing a patent error and fails to do so prior to the close of

the bidding process waives its ability to raise the same objection subsequently in a bid

protest action . . . ."  492 F.3d 1308, 1313 (Fed. Cir. 2007).  This rule prevents the

"inefficient and costly" process of conducting a second round of bidding "after offerors

and the agency ha[ve] expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation." Bannum, Inc. v. United States, 779 F.3d 1376, 1380 (Fed. Cir. 2015) (quoting Blue & Gold, 492 F.3d at 1314) (internal quotation marks omitted).

Finally, in exercising bid protest jurisdiction, the court gives due regard to the interests of national defense and national security and the need for expeditious resolution of the action. 28 U.S.C. § 1491(b)(3); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (giving "great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest" where the case involved "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force," which are "essentially professional military judgments" (citations omitted)).[8]

## B.   Standard for a Temporary Restraining Order or Preliminary Injunction

In deciding whether to grant injunctive relief, a court considers:  (1) whether the plaintiff is likely to succeed on the merits of the case; (2) whether the plaintiff will suffer

---

[8] This court exercises jurisdiction over EMTA's post-award bid protest pursuant to 28 U.S.C. § 1491(b). There is no dispute that EMTA has standing as an "interested party" under 28 U.S.C. § 1491(b) because EMTA was an actual bidder that has a direct economic interest, meaning that it will be prejudiced by the award of the contract to Artek. See CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015). In order to establish a direct economic interest or prejudice in the context of a post-award bid protest, a party must show that it had a "substantial chance" of receiving the contract. Sys. Application & Technologies, Inc. v. United States, 691 F.3d 1374, 1382 (Fed. Cir. 2012) (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)); see also Tinton Falls Lodging Realty, LLC v. United States, No. 2014-5140, 2015 WL 5128658, at *4 (Fed. Cir. Sept. 2, 2015). In this case, EMTA's offer was the next-lowest price and was deemed technically acceptable. AR 621, 623. Therefore, EMTA had a substantial chance of receiving the contract.

irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  "Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction."  Altana Pharma AG v. Teva Pharm. USA, Inc., 566 F.3d 999, 1005 (Fed. Cir. 2009) (citing Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001)).

## III.   DISCUSSION

### A.   **EMTA is not likely to succeed on the merits**

EMTA argues that it is likely to prevail because the government failed to conduct a detailed price realism analysis as required by the FAR and the RFP.  Specifically, EMTA alleges that the government was required, and failed, to conduct "some due diligence by examining the individual cost elements that each offeror was required to submit with their price proposals."  Pl.'s Mem. 9.

In response, the government argues that EMTA has not demonstrated that it will succeed on the merits.  The government acknowledges that it is bound by language in the RFP requiring a price realism analysis, but asserts that it adequately performed the price realism analysis required by the solicitation.  In this connection, the government acknowledges that the SSDD does not use the term "realism," but argues that "the Government's reasoning supports the conclusion that the Government performed a price realism analysis."  Def.'s Opp'n 15.  The government adds that where "the RFP [does]

not make any commitment[] to perform a price realism analysis in any particular manner[,] the methodology is left to the agency's discretion."  Rotech Healthcare, Inc. v. United States, 121 Fed. Cl. 387, 404 (2015) (citing Ne. Military Sales, Inc. v. United States, 100 Fed. Cl. 103, 118 (2011); FCN, Inc. v. United States, 115 Fed. Cl. 335, 375 (2014)); see also Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 358 (2009) ("[T]he nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation.").

EMTA replies that the government's reliance on Rotech Healthcare v. United States is misplaced in that here the government required more detailed cost worksheets from each bidder than were required in Rotech and thus the government could perform a more detailed and rational price realism analysis and that "the RFP in this case contemplated a more detailed price realism analysis [than] merely comparing Artek's total price against [the] other offers and IGCE."  Pl.'s Reply 15-16.  According to EMTA, the government failed to document its price realism analysis and documented only a price reasonableness analysis.[9]  Id.

EMTA also argues in its reply that the agency improperly waived a requirement of the solicitation by finding that Artek's technical proposal was acceptable when Artek

---

[9] In general, "a price reasonableness analysis has the goal of preventing the government from paying too much for contract work.  A price realism analysis, on the other hand, investigates whether the contractor is proposing a price so low that performance of the contract will be threatened."  DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 657 n.5 (2010); see also FAR 15.404-1 (distinguishing "price analysis" from "cost analysis").

failed to provide quantities for a number of items in its material list despite the RFP

requirement to provide "[a] narrative to demonstrate a sound approach and methodology

for accomplishing work requirements identified in the solicitation with the appropriate

skills, equipment, and materials, in the appropriate quantities with specifications, and at

the appropriate time to meet the Government's desired outcomes."  AR 65, 87.

    The court finds that EMTA is not likely to succeed on the merits.  There is no

dispute that the plain language of the RFP required the government to conduct a price

realism analysis.  The RFP provided that "[a]ll offerors['] proposed prices will be

evaluated to ensure they are realistic, reasonable, and complete."  AR 67.  However, the

RFP did not spell out how the price realism analysis would be conducted.  While offerors

were required to provide a detailed cost breakdown, the RFP made clear that "[e]ach

offer received in response to this solicitation will be evaluated based on total proposed

price."  Id.  The RFP also specified that it would use "total proposed price" for ranking

offerors and forwarding technical volumes to the Technical Evaluation Board for

evaluation.  Id.  Thus, the court agrees with the government that the RFP did not mandate

a comparison of individual cost items in performing its price realism analysis, as EMTA

argues.

    In addition, the court agrees with the government that a review of the SSDD

shows that even without use of the word "realism," the government examined Artek's

price and concluded that it was not unrealistically low.  AR 626.  The SSDD notes that

Artek's price was [. . .] percent lower than EMTA's price, but also discusses that Artek's

overhead and profit were [. . .] percent lower than EMTA's rate and that Artek's labor

costs were lower as well.[10]  The SSDD concluded that "[b]ased on this analysis, it is

evident that the direct costs provided by Artek are in line with the other offerors, however

what has set them apart are their indirect and labor costs."  Id.  The SSDD's analysis of

Artek's offer further explained that despite lack of quantities for a portion of the

construction materials, Artek "had a good understanding of work to be performed."  AR

625.  At this stage in the proceeding, the court finds that this documentation is sufficient

to show that EMTA is not likely to succeed on its objection to the agency's price realism

analysis because the SSDD includes an analysis of whether the price was too low (or

unrealistic, reflecting a lack of understanding of the contract requirements) and a

description of Artek's "good understanding" of the work.

The court also finds that EMTA's second argument is not likely to succeed.  The

RFP required a narrative and material list in order "to demonstrate a sound approach and

methodology for accomplishing work requirements . . . [and] clearly demonstrate the

contractor's capability to manage all resources required to perform the requirements

outlined in th[e] solicitation."  AR 65, 87.  Artek provided a detailed narrative to show

how it would produce an end product to meet or exceed contract requirements, AR 580-

---

[10] EMTA points out that the SSDD does not state that the government compared Artek's proposed price ($969,810.80) with the IGCE ($1,669,500.00) or describe why the government did not make this comparison.  Pl.'s Mem. 9-10.  EMTA argues that the comparison would have shown that Artek's price was unrealistically low.  Id.  The court finds that in this case the RFP did not commit the government to perform a price realism analysis based on comparisons with the IGCE and, even if it had, a difference of 40 percent is not necessarily unrealistic.  See, e.g., Preferred Sys. Sols., Inc. v. United States, 110 Fed. Cl. 48, 61 (2013) (finding that a price realism analysis was not arbitrary, capricious, or an abuse of discretion where the bid was 40% lower than the incumbent's proposed price and 54% lower than the IGCE).  In addition, if Artek's price was unrealistic, it is not clear whether EMTA's proposed price ($[. . .]) would have been found realistic either because it was also substantially less than the IGCE.  AR 621.

84, and a list of materials it would use in the project and identified a manufacturer for each of the materials.  AR 437-39.  As noted, Artek did not include an estimated quantity for 32 of its 81 categories of construction materials.  Id.  Artek's proposal might have been stronger if it had included estimated quantities for all of the listed materials.  However, the court cannot say that EMTA is likely to be able to show that it was arbitrary and capricious for the agency to conclude, based on Artek's narrative, the description of the materials and their manufacturers, and the quantities provided for the other 49 categories of construction materials, "that the contractor had a good understanding of work to be performed and that the quantities would be solidified during the design phase."  AR 625.  Similarly, it is unlikely that EMTA will be able to show that it was arbitrary and capricious for the government not to disqualify Artek for award on the grounds that Artek included "TBD" on its material list for certain items.  As noted, all of the proposals, including EMTA's, had weaknesses, but only [. . .] proposal was found unacceptable on the ground that it failed to include any material list.  Here, while Artek failed to include estimated quantities for certain categories of construction materials, it did include a materials list.  Also, EMTA either omitted or did not list separately certain materials that Artek listed as "TBD."  AR 392, 437.  Finally, the RFP noted that any material list provided by an offeror would not be "official" or approved until the construction phase of the project.  AR 65, 87.  Consistent with this provision, Artek provided "estimated" quantities and specified that "estimated quantities may vary after final design."  AR 437.

**B.**     <u>**EMTA may be irreparably harmed**</u>

EMTA argues that without early injunctive relief it will be irreparably harmed because it will likely lose the opportunity to be awarded the contract.  The government asserts that economic harm for the lost opportunity represented by the pending procurement cannot alone satisfy the irreparable harm prong required for injunctive relief because it is present in nearly every successful bid protest.  Instead, the government argues, in order to obtain injunctive relief, a plaintiff must establish that it was denied an opportunity to fairly compete for a contract and that the denial caused imminent harm that was "truly irreparable, e.g., the contractor would be forced out of business."  Def.'s Opp'n 18.  The government notes that EMTA has had many valuable government contracts and will not be forced out of business if it loses the opportunity to perform this one.  Def.'s Opp'n 19 n.2.

As EMTA points out, this court has not required proof that the contractor would be forced out of business to show irreparable harm.  <u>See</u> <u>RLB Contracting, Inc. v. United States</u>, 118 Fed. Cl. 750, 761 (2014) (concluding that "in the context of a bid protest, the loss of an opportunity to compete for an award for which a party would not otherwise be disqualified is sufficient injury to warrant injunctive relief" and distinguishing <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388 (2006) on the grounds that this conclusion supports, but does not presume, that a plaintiff is entitled to injunctive relief); <u>RhinoCorps Co. v. United States</u>, 87 Fed. Cl. 261, 281 (2009) (finding that the plaintiff showed that it would be irreparably harmed without an injunction based on loss of anticipated profits) (citing <u>Bannum, Inc. v. United States</u>, 60 Fed. Cl. 718, 730 (2004));

Ceres Envtl. Servs., Inc. v. United States, 52 Fed. Cl. 23, 39 (2002) ("[L]oss of an opportunity to compete for or obtain a Government contract has generally been found to constitute irreparable injury.") (citing United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998); Magnavox Elec. Sys. Co. v. United States, 26 Cl. Ct. 1373, 1379 (1992); TRW Envtl. Safety Sys., Inc. v. United States, 16 Cl. Ct. 520, 529 (1989)); see also, e.g., Red River Commc'ns, Inc. v. United States, 109 Fed. Cl. 497, 518-19 (2013) ("This court has held that loss of an opportunity to compete constitutes irreparable harm.") (citing Def. Tech., Inc. v. United States, 99 Fed. Cl. 103, 131 (2011)).

Here, the court concludes that EMTA, as the next lowest offeror, may be irreparably harmed without injunctive relief because it will likely lose the opportunity to perform this contract in light of the government's construction schedule.  See Afghan Am. Army Servs., 90 Fed. Cl. at 368 (citing Dubinksy v. United States, 44 Fed. Cl. 509 (1999)).

## C. The balance of hardships and public interest do not favor injunctive relief

Although EMTA recognizes the importance of the project at issue for military operations, it argues that a suspension of performance for less than 30 days to allow the court to review the case under the schedule agreed to by the parties will mitigate any harm.  In response, the government argues that where, as here, the procurement implicates national security and foreign policy concerns that are critical to the success of military operations and to the health and safety of our servicemen and women in the field, no injunction should issue.  Def.'s Opp'n 20 (citing Winter, 555 US. at 24).  Specifically,

the  government argues that while the court should not "blindly accede[]" to national security claims, <u>Afghan Am. Army Servs.</u>, 90 Fed. Cl. at 368, the national security and defense concerns in this case outweigh the countervailing concerns for equity and preservation of the integrity of the procurement process.  In support, the government relies on the declarations from Major General Nagata and Colonel Walker to establish that "[b]eneficial occupancy of the CJSOTF-S headquarters facility at Incirlik Air Base is, from an operational standpoint, critical."  Def.'s Opp'n A3.  In particular, the government states that these declarations make clear that "delays in relocating the CJSOTF-S headquarters to Incirlik Air Base will be detrimental to the overall coalition effort and mission to provide support to the appropriately vetted Syrian opposition [and] ultimately, a delay in relocation of this headquarters is a threat to the success of the program."  <u>Id.</u>

While EMTA suggests that a brief delay will not be harmful, the court agrees with the government that the national security, foreign policy, and public interest concerns at stake in this procurement clearly outweigh the potential economic loss to EMTA.  The court is required to give due regard to these interests and professional military judgments. <u>See</u> 28 U.S.C. § 1491(b)(3); <u>see also</u> <u>Winter</u>, 555 U.S. at 24.  Accordingly, the court denies EMTA's request for temporary and preliminary injunctive relief.

## IV.   CONCLUSION

For the reasons stated above, EMTA's Motion for a Temporary Restraining Order and Preliminary Injunction is **DENIED**.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge